452 P.2d 128

J. M. CHAPMAN and Mary Ann Chapman, his wife; J. M. Chapman as General Partner of Yuma Desert Farms; and Yuma Desert Farms, Appellants,

v.

Robert H. HARGER, Appellee.

No. 1 CA–CIV 638.

Court of Appeals of Arizona.

March 18, 1969.

Herbert Mallamo, Phoenix, for appellants.

Stevens & Leibow, by Howard P. Leibow, Phoenix, for appellee.

STEVENS, Judge.

The primary question presented to the Court is the sufficiency of the evidence to sustain a judgment in favor of a seller against the claimed buyer where the claim for relief arises out of a writing relating to three State leases one of which was transferred prior to the execution of the writing. The following persons and organizations should be borne in mind in connection with this opinion; Harger; Chapman; Mrs. Chapman; Divelbess; Desert Farms, LTD, a limited partnership; Yuma Desert Farms, a limited partnership; and Dateland Desert Farms, a limited partnership. Additional names and organizations will be mentioned as is appropriate in the opinion.

The case was tried to the Court without a jury. At the trial, Harger was in the position of being the plaintiff. Two persons testified, these being Divelbess and Chapman. Harger did not testify. Documents were received in evidence. Harger's counsel laid the foundation for the background of the transaction which is the subject of this litigation and created the setting for the trial. In this setting oral testimony was received which was not strictly limited to the documents and their content thus presenting a more complete picture as to the whole transaction. In analyzing the evidence, we recognize the oft stated rule that the evidence must be construed most strongly in favor of the judgment. Smith v. Goodman, 6 Ariz.App. 168, 430 P.2d 922 (1967) and Chadwick v. Winn, 101 Ariz. 533, 421 P.2d 890 (1966). We find that the evidence does not support the judgment.

In the early part of January, 1958, there were a number of limited partnerships interested in putting together a farm operation in Yuma County. Desert Farms LTD was described as the parent partnership. Harger was the general partner of Dateland Desert Farms. At one time there was an organization known as Harger & Associates, the exact nature thereof not being

348

disclosed in the record. The record contains reference to Kel-Realty, Inc.

The transaction with which we are here concerned relates to 627.48 acres in Section 18; 40 acres in Section 24; and 80 acres in Section 23. The largest parcel was described as a State of Arizona Grazing Lease. The 40 and the 80 were part of a single State of Arizona Agricultural Lease.

The articles of limited partnership were prepared by a California attorney who apparently had some interest in the overall plan. These articles are not in evidence and this Court is informed only as to the names of the general partners in Yuma Desert Farms and in Dateland Desert Farms so that this Court is without information as to whether any of the parties before this Court may have been limited partners in any of these organizations. Divelbess may have had a small interest, the presence of which is not material to this opinion.

Some time prior to 25 January, 1958, there was a meeting in the Divelbess office. There were five or six limited partnerships represented at the meeting. The Divelbess office held five or six "escrows". These were described as not being true escrows but more in the nature of "holding papers". Everyone was friendly. The record indicates that prior to that time the interests of Harger & Associates had been transferred to Dateland Desert Farms and as we stated earlier Harger was then the general partner thereof. The various State leases were to be held in the name of Yuma Desert Farms or Dateland Desert Farms with assignments back being held in the so called escrows. Apparently numerous leases were so treated.

On 25 January, 1958, an option agreement was prepared wherein Harger as an individual was the prospective seller and Yuma Desert Farms was the prospective buyer. This document recited the three acreages above referred to. It was signed by Harger and was not executed on behalf of Yuma Desert Farms. At that time Chapman was the general partner of Yuma Desert Farms and Harger was the general partner of Dateland Desert Farms. On 23 April, 1958, the option agreement never having been placed in effect, the agreement before this Court was executed. The same three acreages were listed. Harger in his individual capacity agreed to sell to Yuma Desert Farms for $7475, being roughly $10 per acre although the price was a lump sum and not spelled out at so much per acre. The agreement called for a down payment of $1868.75 which was paid, the balance to be paid in four annual installments beginning 15 April, 1959. The agreement did not contain a promise to buy. It called for the establishment of an escrow which was not done. It was executed by Chapman as "president" of Yuma Desert Farms. In addition to the down payment the installment payments of 1959 and 1960 were paid.

Shortly after the 15 April, 1961 due date Harger demanded of Divelbess that Divelbess surrender the leases of the three acreages to Harger due to the non-payment of the 1961 installment. The agreement did not contain any express provisions authorizing forfeiture in the event of non-payment. The exact date of this demand is not in the record. Apparently the demand was conveyed to Chapman for Chapman's attorney wrote to Divelbess objecting to the demand and urging that under the provisions of A.R.S. § 33–741 Chapman was entitled to a 9-month grace period. When the nine months were about to expire, Divelbess made demand for payment advising that in the alternative there would be a forfeiture. In the meantime and on 10 November, 1961, Chapman tendered to Divelbess the sum of $180.59 urging that this sum was the unpaid balance on the purchase price of the 40 acres. This tender was neither accepted nor returned. On 15 January, 1962, Chapman as the general partner for Yuma Desert Farms and as the general partner for Dateland Desert Farms filed suit to restrain the surrender of the 40 acre lease to Harger. He was willing to forfeit any money paid into the so called

escrow under the 23 April, 1958 writing. Harger countered demanding the enforcement of a forfeiture and the return of the leases on the three acreages.

At a pre-trial conference Chapman dismissed his complaint as to Harger and Harger was granted leave to amend thereby assuming the roll of plaintiff in the trial in question. Harger pled in the alternative to enforce the return of the three acreages or for a money judgment for the unpaid installments.

We must now go back to early 1958. The clear import of the Divelbess testimony is that the lease for the 40 acres was never in his possession and that he was unable to explain why it was included in the 23 April, 1958 writing. From the uncontradicted Chapman testimony, the 40 acres were the individual property of Harger. It was the key piece of land to the entire planned development. It was selected as the site for a well. A well was sunk with money furnished by the parent Desert Farms to Dateland Desert Farms. Harger was supposed to transfer the 40 acres to Dateland Desert Farms. At that time Chapman was general partner for Yuma Desert Farms and Harger was general partner for Dateland Desert Farms. On 17 March, 1958 Harger wrote to the stockholders of Kel-Realty advising that the property of Harger & Associates had been taken over by Dateland Desert Farms and by Desert Farms LTD, the latter putting up the money for the development. On 1 April, 1958 Harger in his individual capacity made an application to the Arizona State Land Department to transfer the 40 acres to Dateland Desert Farms and on 3 April Harger, as general partner for Dateland Desert Farms, executed an acceptance of the transfer.

Thus it appears that prior to the 23 April, 1958 writing, Harger had effectively divested himself of any individual interest which he had, and which he could personally sell, in the 40 acres in question. On a date which is not established in the record

Chapman succeeded Harger as general partner of Dateland Desert Farms. The evidence clearly establishes that at the time of the trial Harger was not in a position to restore to himself the interest in the 40 acres which would be necessary to enable him to transfer any interest in the 40 acres. On 13 June, 1958, on behalf of Dateland Desert Farms, Chapman made a delayed report to the Arizona State Land Department reciting the drilling of a 1500 foot well on the 40 acres and the expenditure of over $54,000.

Later the State of Arizona sold the 40 acres at public auction and Dateland Desert Farms purchased the same for $5000.

The trial court rendered judgment in favor of Harger and against Mr. and Mrs. Chapman individually as well as against Yuma Desert Farms and Chapman as its general partner for $2803.13, plus interest and costs.

There was an appeal which was assigned this Court's number 1 CA–CIV 180. When this Court reviewed the record it was of the opinion that the appeal was premature and the appeal was dismissed without prejudice. This was prior to the rendition of the opinion in Eaton Fruit Company v. California Spray-Chemical Corp., 102 Ariz. 129, 426 P.2d 397 (1967). During the process of perfecting the renewed appeal, Chapman died, Mrs. Chapman was appointed as executrix and in that capacity was substituted for him. We have nevertheless continued the caption of this case in its original form on the second appeal. The records from 1 CA–CIV 180 were transferred to the present cause as contemplated by the opinion in City of Tucson v. Wondergem, 4 Ariz.App. 291, 419 P.2d 552 (1966).

Chapman urges that the 23 April, 1958 writing created no obligation on the part of Yuma Desert Farms to buy. Harger urges that even absent a contractual obligation to buy, the payment of installments converted the writing into a binding sale and purchase agreement. Harger cites

United Farmers' City Market, Inc., v. Donofrio, 43 Ariz. 35, 29 P.2d 144 (1934). In our opinion we need not decide this legal point for the reasons herein stated.

 Harger urges that he can plead inconsistent remedies, one for forfeiture and the other for the recovery of the purchase price. In the abstract we agree. It is noted that he earlier elected to seek the return of the leases which he had "sold" and to effect the forfeiture of the money which had theretofore been paid. Chapman was willing to do so on condition that the 40 acres were not effected. After it was established that Harger had put it beyond his power to sell the 40 acres to Yuma Desert Farms by transferring 40 acres to Dateland Desert Farms at a time when he, Harger, was the general partner of Dateland Desert Farms, he proceeded with the trial on the theory of recovering the unpaid purchase price. We hold that Harger purported to sell to Yuma Desert Farms that which he could not sell, namely the 40 acres, and that the contract was not enforceable by Harger. For this reason we need not decide the application of the principle urged by Harger when Harger urged that the making installment payments converted the 23 April, 1958 writing into a binding contract.

While it is true that a party may plead inconsistent remedies, we hold that, even had there been no impediment to the contract and even had Harger been in a position to sell the 40 acres, he made his election at the time of the delinquency in April 1961 as well as at the time he asserted his defense to the original Chapman complaint. There is a definite distinction between an election as to substantive rights and an election as to procedural remedies. In this instance Harger elected between substantive rights. Wilhorn Builders v. Cortaro Management Co., 81 Ariz. 381, 307 P.2d 94 (1957).

This cause is reversed with instructions to vacate the judgment in favor of Harger and to enter judgment in favor of the Chapmans individually and as general partner of the two limited partnerships.

DONOFRIO, C. J., and CAMERON, J., concur.